## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A

## SEARCH WARRANT

I, Craig S. Mehrmann, a Special Agent (SA) with the Federal Bureau of Investigation (FBI),

United States Department of Justice, having been duly sworn, hereby depose and state:

## INTRODUCTION

1.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code. That is, I am an officer of the

United States who is empowered by law to conduct investigations of, and make arrests for,

violations of Title 18 of the United States Code.

2.      I am a Special Agent with the FBI and have been since February 2023. I am

currently assigned to the Boston Division, Portland Resident Agency, of the FBI. As part of my

duties, I investigate crimes involving the sexual exploitation of minors, including the production,

possession, and distribution of child pornography. I have received formal and on-the-job training

in the investigation of cases involving the sexual exploitation of children. As a Special Agent,

through my training, education, and experience, I have become familiar with the efforts of

persons involved in criminal activity to avoid detection by law enforcement, to include matters

involving sexual exploitation of children. I have worked and consulted with highly experienced

law enforcement professionals who are skilled in working cases involving sexual exploitation of

children. I have received training on the proper investigative techniques for these violations,

including the use of surveillance techniques and the application and execution of arrest and

search warrants.

3.      This affidavit is submitted in support of an application for a search warrant for

the entire property located at 47 Otuhk Lane, Indian Township, Maine, 04668, including any

outbuildings, storage units, and detached garages, and vehicles on the property (hereinafter the

"Subject  Premises"), as well as any computers or data storage devices found therein (collectively

1

the "Subject Premises"), and the person of Kuhas Polchies, wherever located in the District of Maine as more particularly described in Attachment A of this Affidavit, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, U.S.C § 2251(a) (sexual exploitation of children), 2252A(a)(5)(B) and (b)(2) (possession of and access with the intent to view child pornography), and 2252A(a)(2) and (b)(1) (receipt or distribution of child pornography), which items are more specifically described in Attachment B of this Affidavit.

4.      The information contained in this affidavit is based on my personal knowledge, as well as information relayed to me by other law enforcement agents and officers involved in this investigation.

## STATUTORY AUTHORITY

5.      As noted above, this investigation concerns alleged violations of the following:

U.S.C. § 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

6.      18 U.S.C. §2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by

computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

7.      18 U.S.C § 2251(a), Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

8.      As used in the preceding paragraphs, "child pornography", also known as "Child Sex Abuse Material" (CSAM), as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

## BACKGROUND ON FACEBOOK AND FACEBOOK MESSENGER

9.      Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share

3

communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

11.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

12.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

13.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their

4

whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

14.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

15.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

16.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

17.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

18.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through

5

the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

## PROBABLE CAUSE

19.     On March 21, 2024, Calais Police Department Patrolman Christopher McCann met with VICTIM 1 ("V1") regarding Kuhas Polchies (Polchies), who had allegedly been impersonating and sending nude and sexually explicit photos and videos of V1, that were produced by Polchies when V1 was 15 years old, to people on Facebook Messenger. Polchies was allegedly sending said photos and videos from a Facebook account with numerical account identifier 100072009131010 that was created and previously controlled by V1 ("Facebook Account 1" or "FA1"). V1 provided Patrolman McCann screenshots of the photos and videos allegedly transmitted by Polchies on Facebook Messenger from FA1.

20.     On April 9, 2024, Patrolman McCann referred the incident to FBI Special Agent (SA) Craig Mehrmann. In the Calais Police Department report and in a later interview of V1 by SA Mehrmann, V1 stated that she came into possession of sexually explicit nude photos and videos of V1 from a prior coworker, COOPERATING WITNESS 1 (CW1), who had been contacted on Facebook Messenger from FA1 by someone claiming to be V1.

21.     According to V1, and as reflected in screenshots of communications, on or around February 20, 2024, FACEBOOK USER 1, using a Facebook account with a numerical account identifier of 100072009131010 (FA1), transmitted sexually explicit photos and videos of V1 to

6

CW1 via Facebook Messenger. CW1 then contacted V1 inquiring as to whether FA1 belonged to

V1 and if she was transmitting said images and videos, stating the following (EXHIBIT 1):[1]

    a. **CW1**: Is your [FA1, account identifier 100072009131010] account yours?

    b. **V1**: No. That is not mine anymore.

    c. **CW1**: Whoever it is added me and send me a bunch of your nudes. Sent*

    d. **V1**: Can you screenshot and send to me please. And delete the whole chat.

    e. **CW1**: [CW1 sent screenshots to V1 of the referenced photos and videos from

        the Facebook Messenger chat between CW1 and FACEBOOK USER 1.]

    f. **CW1**: There's videos too.

    g. **V1**: Delete all evidence please. I'll owe you one fr. Illsmoke you up or

        something just get rid of the photos please after you send them to me.

    h. **CW1**: [CW1 then sent V1 screenshots of the Facebook Messenger chat between

        CW1 and V1.] All set and deleted. I'm sorry this happened to you. I assume it's

        your baby daddy.

    i. **V1**: Thanks. When was this exactly?

    j. **CW1**: 9 am or so.

    k. **V1**: Okay. Delete this chat too please. Pls block the accout.

    l. **CW1**: [CW1 then sent V1 more screen shots of the Facebook Messenger chat

        between CW1 and FACEBOOK USER 1.] Can you prove that you are you

        though please?

    m. **V1**: Thanks for these.

    n. **CW1**: I'm so confused.

---

[1] The relevant substance of the communications are recited in the body of this affidavit. All of the exhibits are submitted under seal because they contain either contraband images or other images of the alleged victim in this case.

o.  **V1**: I'm 15 in most of those. [V1 then appeared to send a video message to CW1.]

p.  **CW1**: He's still pretending to be you. Blocking now thanks for clearing it up.

q.  **V1**: I appreciate it.

r.  **CW1**: [CW1 then sent a screenshot showing that FACEBOOK USER 1 had been blocked.] Deleting this convo. Again I am really sorry this happened to you it's next level fucked up and I'm pretty sure illegal.

s.  **V1**: It is. Thanks.

t.  **CW1**: [CW1 then sent V1 a screenshot showing that the Facebook Messenger chat between CW1 and V1 had been deleted by CW1.] To show deleted. I hope you have a better day.

u.  **V1**: Thank you. I have a question.

v.  **CW1**: Icprobably have an answer what's up?

w.  **V1**: Would you be willing to help with my case? The only proof I have to get my baby daddy in jail is what you sent me. I know you don't have the conversation anymore but if the cops come to you and you're willing to speak with them and provide whatever info you can, it could really help me get my children into my care and put him in jail.

x.  **CW1**: Sure I can do that. Heading back to sleep right now because I work overnights tonight. But yes absolutely anything I can do to help.

22.     SA Mehrmann reviewed the screenshots provided to Patrolman McCann by V1. The screenshots appeared to depict sexually explicit nude images of a young woman, several of which V1 stated to be images of herself when she was 15 years old. The images appeared to be

screenshots of a text message conversation between V1 and CW1. There also appeared to be screenshots of videos containing similar content, but the videos themselves are not viewable.

23.     V1 stated to SA Mehrmann that all of the above referenced images and videos were produced by Polchies, including the images and videos of her that were produced when she was 15 years old. V1 determined that she was 15 years old at the time some of the photos and videos were produced because she remembers where and when the photos and videos was produced, and because she had dyed blue hair in some of the photos and videos, which she has not had since she was 15 years old. V1 stated to SA Mehrmann during an interview on May 7, 2024 that her hair color was changed to brown with purple tips by the time she turned 16-years-old. On May 8, 2024, SA Mehrmann reviewed time stamped images taken from FA1 which showed V1's hair color change from blue on February 25, 2018, at which time V1 would have been 15 years old [EXHIBIT 2], to brown with purple tips on February 28, 2019, at which time V1 would have been 16 years old [EXHIBIT 3]. Three more Facebook photos and a screenshot of the collection of photos from FA1 have been included for reference as EXHIBIT 4 through EXHIBIT 7.

24.     Based on memory, V1 is confident that all images and videos transmitted by FA1 to CW1 that show V1 with (1) blue hair or (2) show V1's vagina were produced when V1 was approximately 15 years old. V1 stated to SA Mehrmann that she did not allow Polchies to produce photos or videos that show her vagina after the age of 15 years old.

25.     Based on visual inspection of the referenced photos and videos by V1 and from being familiar with her own body, V1 stated to SA Mehrmann that she is confident that all referenced close-up images of female genitals that were transmitted from FACEBOOK USER 1 to CW1 that do not include depictions of V1's face were images of V1's genitals.

26.     V1 believes that Polchies is controlling two old Facebook accounts that previously belonged to and were controlled by V1: Facebook account numbers 100072009131010 (FA1) and 100006029835267 (FA2). V1 believes Polchies is controlling

these accounts because Polchies allegedly confiscated her phone while they were living together before V1 fled to a women's shelter in or around February 2023. V1 has not been able to regain access to FA1 nor FA2 since Polchies confiscated her phone prior to approximately February 2023.

### FACEBOOK USER 1 Communications

27.     Based on the above facts, upon review by SA Mehrmann, four photos and two screenshots of videos transmitted by FA1 to CW1 appear to constitute child pornography as defined by 18 U.S.C. § 2256(2)(A)(v) as lascivious exhibition of the anus, genitals, or pubic area of any person:

   a. In EXHIBIT 1 on the top right of page 5 there appears to be nude photo of V1 with blue dyed hair facing away from the camera, bending forward with her hands on her glutes, pulling them apart to reveal V1's vagina and anus. Labeled on the exhibit as IMAGE A

   b. In EXHIBIT 1 on the bottom of page 5 there appears to be a nude photo of V1 with blue dyed hair laying on her back with their legs spread apart to show a close-up image of her exposed vagina. Labeled on the exhibit as IMAGE B

   c. In EXHIBIT 1 on the bottom of page 2 and top of page 6 there appears to be identical screenshots of a close-up video of V1 masturbating her vagina. Labeled on the exhibit as IMAGE C

   d. In EXHIBIT 1 on the top of page 6 directly below IMAGE C there appears to be a screenshot of another close-up video of V1 masturbating her vagina. Labeled on the exhibit as IMAGE D

e.  In EXHIBIT 1 on the bottom-left of page 6 and top-left of page 8 there appears to be a close-up photo of V1's vagina and anus depicting V1 masturbating her vagina. Labeled on the exhibit as IMAGE E

f.  In EXHBIT 1 on the bottom-right of page 6 and top-right of page 8 there appears to be another close-up photo of V1's vagina and anus depicting V1 masturbating her vagina. Labeled on the exhibit as IMAGE F

g.  In EXHIBIT 1 on page 2 there appears to be a group of images sent as a screenshot that include eight nude images of V1 with her breasts exposed and one close-up image of V1's exposed vagina. Labeled on the exhibit as IMAGE G

28.  Two other sexually explicit images of V1 were transmitted by FA1 to CW1:

a.  In EXHIBIT 1 on page 4 there appears to be a nude full body photo of V1 sitting on the edge of a piece of furniture with her breasts covered by her arms and hands, and her vagina covered by her right leg.  Labeled on the exhibit as IMAGE H

b.  In EXHIBIT 1 on the top-left of page 5 there appears to be a full body nude photo of the back of V1 with blue dyed hair standing upright. Labeled on the exhibit as IMAGE I

29.  On or around February 20, 2024, FACEBOOK USER 1, using a Facebook account with a numerical account identifier of 100072009131010 (FA1), transmitted sexually explicit photos and videos of V1 to CW1 via Facebook Messenger as part of an unsolicited sexting chat to CW1, stating the following:

a. **FACEBOOK USER 1**: [FACEBOOK USER 1 sends IMAGE H, a nude full body photo of V1 sitting on the edge of a piece of furniture with her breasts covered by her arms and hands, and her vagina covered by her right leg.] I like to have fun. [FACEBOOK USER 1 sends a 'smirking emoji' followed by a 'kissing emoji'.]

b. **CW1**: Same. You work today?

c. **FACEBOOK USER 1**: I might be, I'm sickk. I hung out with my baby daddy for a bit and I ended up catching a cold or something. [FACEBOOK USER 1 sends a 'disappointed emoji'.]

d. **CW1**: Oh darn that sucks.

e. **FACEBOOK USER 1**: [FACEBOOK USER 1 sends IMAGE I (a full body nude photo of the back of V1 with blue dyed hair standing upright), IMAGE A (a nude photo of V1 with blue dyed hair facing away from the camera, bending forward with her hands on her gluts, pulling them apart to reveal V1's vagina and anus), IMAGE J (on page 5 of EXHIBIT 1 there appears to be an image of V1 with pony tails making a fish face with digital pink horns wearing a dark colored t-shirt with patterned suns, moons, and yin-yang symbols), IMAGE B (a nude photo of V1 with blue dyed hair laying on her back with their legs spread apart to show a close up image of her exposed vagina), IMAGE C (a screenshot of a close up video of V1 masturbating her vagina), IMAGE D (a screenshot of another close up video of V1 masturbating her vagina).] I'm rubbing my clit sending you these. [FACEBOOK USER 1 sends a 'drunk' emoji.] I'm gonna cumm. I'm cumming. [FACEBOOK USER 1 sends a 'pleasure' emoji.]

f. **CW1**: Well damn.

12

g. **FACEBOOK USER 1**: One more time. Can I see your cock. [FACEBOOK USER 1 sends a 'pleasure' emoji.] [FACEBOOK USER 1 sends IMAGE E (a close-up photo of V1's vagina and anus depicting V1 masturbating her vagina] and IMAGE F (another close-up photo of V1's vagina and anus depicting V1 masturbating her vagina)].

h. **CW1**: [CW1 attempts a video call with FACEBOOK USER 1 at 9:06 am.] Who is this really though? The ex?

i. **FACEBOOK USER 1**: My phone died. [FACEBOOK USER 1 sends a 'sad' emoji.]

j. **CW1**: Who is this?

k. **FACEBOOK USER 1**: No, this is really me? My ex doesn't have access to any profile of mine.

## <u>LINKING FACEBOOK ACCOUNT 1 (FA1) TO POLCHIES</u>

30.      On or about April 22, 2024, SA Craig Mehrmann requested preservations and subpoenas be sent to Meta Platforms for subscriber/account information, including name, date of birth, address, phone number, email address, registration date, registration IP address, and any other identifying information, as well as all IP logins, for the period January 22, 2024 to April 22, 2024 for the following Facebook profiles:

a. Unique ID 100072009131010 (FA1; the account from which the above photos and videos were transmitted on February 20, 2024).

b. Unique ID 100006029835267 (FA2; another account that previously to belonged to V1 that she alleges is now managed by Polchies and inaccessible to V.).

    c.  Unique ID 100000772915638 with vanity name "kuhas.polchies" (FA3; a Facebook account that allegedly belongs to the subject). The Facebook subpoena return included phone number(s) provided by the account holder. "Verified" indicates the account holder responded to a text sent to the listed phone number to verify control over the phone number. Cellular phone number 207-214-8210 was verified on June, 26, 2020 according to the subpoena return, which is the most recent phone number verified on this account.

    d.  Unique ID 100024919910736 with vanity name "kuhas.polchies.908" (FA4; a second Facebook account that allegedly belongs to the subject).

31.    On April 29, 2024, pursuant to Administrative Subpoena 959441, served via email on the same date, Pioneer Broadband provided subscriber information for several IP addresses associated with repeatedly logging into and out of the above referenced Facebook accounts. An excerpt of Facebook in/out information below illustrates user overlap among the above referenced Facebook accounts:

    a.  74.221.77.201 on 4/22/2024 at 14:29:16 UTC [gleaned from Facebook account, unique ID 100072009131010 (FA1)]

    b.  74.221.77.201 on 4/22/2024 at 14:28:38 UTC [gleaned from the "Kuhas Polchies" Facebook account, vanity name kuhas.polchies, unique ID 100000772915638 (FA3)]

    c.  74.221.75.123 on 3/22/2024 at 10:11:24 UTC [gleaned from Facebook account, unique ID 100072009131010 (FA1)]

    d.  74.221.75.123 on 3/22/2024 at 10:11:25 UTC [gleaned from the "Kuhas Polchies" Facebook account, vanity name kuhas.polchies, unique ID 100000772915638 (FA3)]

14

    e. 74.221.75.123 on 3/22/2024 at 11:05:47 UTC [gleaned from the "Kuhas Polchies" Facebook account, vanity name kuhas.polchies.908, unique ID 100024919910736 (FA4)]

    f. 74.221.75.123 on 2/20/2024 at 14:55:41 UTC [gleaned from Facebook account, unique ID 100072009131010 (FA1)]

    g. 64.89.247.167 on 4/5/2024 at 23:32:44 UTC [gleaned from Facebook account, unique ID 100072009131010 (FA1)]

    h. 64.89.247.167 on 4/5/2024 at 23:58:24 UTC [gleaned from the "Kuhas Polchies" Facebook account, vanity name kuhas.polchies, unique ID 100000772915638 (FA3)]

32.    The Pioneer Broadband response showed that all above-referenced IP addresses resolve to the following account:

- Account #: 025215
- Customer: Kuhas Polchies
- Phone: 207-214-8210
- Email: kuhaspolchies@yahoo.com
- Address: 47 Otuhk LN, Indian Township, ME 04668

33.    On May 1, 2024, pursuant to Administrative Subpoena 959943, served via email on April 30, 2024, US Cellular provided subscriber information, toll records, and device information for target number 207-214-8210 for the time period January 1, 2024 to April 30, 2024. The US Cellular records showed the following subscriber information:

    a. Name: Eddie C. Lozada

    b. DOB: [--/--/]1957

    c. Activated: 6/11/2020

    d.  Authorized Contact on account: Brenda Lozada

    e.  Primary Address: 7 Birch Circle, Princeton, ME 04668

    f.  Billing Address: PO Box 537, Princeton, ME 04668

    g.  Primary Phone Numbers: 207-214-3984 and 207-290-7065

    h.  Email Addresses: elozada1920@hotmail.com and alamossit@hotmail.com

34.    PO Box 537, Princeton, ME 04668 is the same address that is listed on Polchies' DMV records as of April, 23 2024.

35. The US Cellular records showed the following device information:

    a.  IMSI: 311580726722833

    b.  IMEI: 35839341775340

    c.  Equipment Description: Apple iPhone 14

36.    According to V1, Brenda Lozada is Polchies' mother and is married to Eddie Lozada. Accurint records reviewed by SA Mehrmann show "Brenda Lozada", "Brenda Polchies", and "Eduardo Lozada" as associates of Kuhas Polchies.

37.    Based on the above findings, the only IP address used to log into FA1 on February 20, 2024, totaling ten logins throughout the day, was 74.221.75.123, the same day the referenced photos and videos were transmitted from FA1 to CW1 via Facebook Messenger. Moreover, an individual logged into FA1, FA3, and FA4 on March 22, 2024 from IP address 74.221.75.123; an individual logged into both FA1 and FA3 on April 4, 2024 from IP address 64.89.247.167; and an individual logged out of FA1 and logged into FA3 on April 22, 2024 from IP address 74.221.77.201. All the above IP addresses (74.221.75.123, 64.89.247.167, 74.221.77.201) resolve to the referenced Pioneer Broadband account belonging to Kuhas Polchies.

16

38.    An open-source search for Facebook profile "Kuhas Polchies", unique ID 100000772915638 (FA3), yielded an account with multiple profile pictures depicting a male identified by V1 to be Polchies. The profile pictures also match the likeness of Polchies' Maine driver's license photo. Under the "About" section, it is noted that the account owner lives in Waite, Maine and studied at Lee Academy in Lee, Maine.

39.    An open-source search for Facebook profile "Kuhas Polchies", unique ID 100024919910736 (FA4), yielded an account with multiple profile pictures depicting a male identified by V1 to be Polchies. The profile pictures also match the likeness of Polchies' Maine driver's license photo. Under the "About" section, it is noted that the account owner's hometown is Princeton, Maine and that the account owner currently lives in Peter Dana Point, Maine.

40.    In sum and summary, based on the above findings, it is suspected that Polchies is impersonating V1 on social media using V1's previous Facebook account, FA1, and has used FA1 to transmit CSAM that depicts V1 at the age of 15 years old.

### SURVEILLANCE CONDUCTED

41.    Open-source property records yield inconsistent results for the physical location of 47 Otuhk Lane, Indian Township, Maine, 04668, and property records for Indian Township do not appear to be available. V1, who lived with Polchies until February 2023, identified Polchies' residence as 47 Otuhk Lane, Indian Township, Maine. Pioneer Broadband subpoena and Accurint records show Kuhas Polcies residential address as 47 Otuhk Lane, Indian Township, Maine.

42.    On May 20, 2024, a physical surveillance was conducted by the FBI by air. The agent observed 47 Otuhk Lane, Indian Township, Maine, 04668, to be a dark blue, single story, manufactured home with a dark gray roof. There is a single window on the east side of the structure facing out toward Otuhk Lane. There are wooden porches leading into entrances on the north and south sides of the structure. Parked in a dirt driveway on the north side of the structure

appears to be a white sedan, with a black roof and trunk, identified by V1 to be Polchies' vehicle that is currently not functioning. Parked adjacent to one another on the southwest corner of the structure next to a tree there appears to be a white recreational vehicle (RV) and a boat with a burgundy coloredfolded canopy parked on a trailer. Upon review of pictures of the residence depicted in Attachment A, V1 positively identified the residence as the residence belonging to Kuhas Polchies, 47 Otuhk Lane, Indian Township, Maine, 04668.

43.     Based on my training and experience, I know devices referenced throughout this affidavit, which may contain contraband, fruits, and evidence of crime, are by their very nature portable. This includes as example, but is not limited to, compact storage devices such as smart phones, laptop computers, and tablets. In my training and experience, I know it is not uncommon for individuals to keep these devices on their person or in multiple locations within their premises, including in outbuildings, motor vehicles, and watercraft.

## BACKGROUND ON ELECTRONICALLY STORED IMAGE AND VIDEO FILES

44.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that modern technology allows individuals to maintain and share electronic image and video files in multiple ways using computers and the internet.

45.     Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 2 Terabytes (TB) of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

46.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. Digital images, including child pornography, can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "instant messaging"), and easy access to the Internet, the instantaneous transfer of digital images has become easy.

47.     The computer's ability to store images in digital form makes the computer itself an ideal repository for digital image and video files. The size of the electronic storage photos and videos (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not uncommon. Other photos and videos storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that can be plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those photos and videos storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Some photos and videos storage devices can easily be concealed and carried on an individual's person. Smart-phones and/or mobile phones are also often carried on an individual's person.

48.     Individuals also use online resources to retrieve and store digital images and video files from years previous, including on services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in

19

any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of digital files can be found on the user's computer or external photos and videos in most cases.

49.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files), Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

50.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage photos and videos. Thus, the warrant applied for would authorize the seizure of electronic storage photos and videos or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

51.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable photos and videos player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data. Examining

data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

52.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription. Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer. Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent of 18-29 year olds, 92 percent of 30-49 year olds, and 79 percent of 50-64 year olds owned smartphones in 2019.

53.     Based on my training and experience, I know that much of the media referenced above, which may contain contraband, fruits and evidence of crime, is by its very nature portable, this includes as example but is not limited to extremely compact storage devices such as thumb drives, laptop computers, and smart phones. In my training and experience, I know it is not uncommon for individuals to keep such media in multiple locations within their premises, including in outbuildings and motor vehicles. Moreover, I know the SUBJECT PREMISES to be a single family-type dwelling, and it is likely that any resident would have practical, as well as legal, access to any vehicle kept on the property. V1 also stated to SA Mehrmann that Polchies is the only adult currently residing in the residence.

54.     I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

21

55.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.

56.     Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

57.     Wholly apart from user-generated files, computer storage photos and videos—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

58.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

59.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the

22

warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

60.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage photos and videos, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

61.     Information stored within a computer and other electronic storage photos and videos may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage photos and videos (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage photos and videos. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware

detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage photos and videos activity can indicate how and when the computer or storage photos and videos was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage photos and videos that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage photos and videos access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage photos and videos may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage photos and videos (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

24

62.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

63.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

64.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

65.     I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

66.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage photos and videos, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage photos and videos ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

67.    The volume of evidence- storage photos and videos such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

a.    Technical requirements- analyzing computer hardware, computer software or storage photos and videos for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence

is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

68.     Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

69.     The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

70.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

71.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage photos and videos that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the photos and videos or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the

27

entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

72.     The requested warrant authorizes a review of electronic storage photos and videos seized, electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

73.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones and laptops made by Apple and other manufacturers—including the devices associated with the subject, Kuhas Polchies, in this case—offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

74.     The passcodes that would unlock any mobile devices found during the search of the SUBJECT PREMISES are not currently known to law enforcement. Thus, it may be useful to press Polchies' finger(s) to any such device's fingerprint sensor or to hold the device up to his face, if any such device is enabled with facial recognition capabilities, in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant. Moreover, effective use of these biometrics would be additional evidence of Polchies' ownership and control of any subject device.

28

75.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Kuhas Polchies to the sensor of any devices whose search is authorized by the requested warrant or place the devices in front of his face for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

## CONCLUSION

76.    Based upon the information provided above, I respectfully submit that probable cause exists to believe that there has been a violation of Title 18, United States Code, Sections 2251(a), 2252A(a)(5)(B), and 2252A(a)(2), and that evidence of said violations exist at the SUBJECT PREMISES located at 47 Otuhk Lane, Indian Township, Maine, 04668, as more fully described in Attachment A of this affidavit, and in computers or electronic photos and videos therein (SUBJECT PREMISES),  and the person of Kuhas Polchies. As described above, the types of computing and storage devices capable of sending, receiving, and storing information relevant to the above-described crimes can be small, mobile, and easily hidden. They may therefore be found anywhere in the SUBJECT PREMISES, in any vehicles Kuhas Polchies has access to, or on his person.

77.    The evidence to be seized, more fully described in Attachment B, includes evidence of: the possession and distribution of the subject images sent on Facebook Messenger described above; the use and possession of the above-described Facebook accounts; and the location and identity of the person who used the Facebook accounts at the time the messages were sent.

78.    Therefore, I respectfully request that the attached warrant be issued authorizing the search of the SUBJECT PREMISES, individual, and vehicle, and any computers or other electronic photos and videos therein, as fully described in Attachment A, for items described in Attachment B of this affidavit.

Craig S. Mehrmann
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: May 22 2024

City and state: Bangor, ME

_Judge's signature_

John C Nivison U.S. Magistrate Judge
_Printed name and title_

30